1

2

3

4

5

6

7          IN THE UNITED STATES DISTRICT COURT

8            FOR THE DISTRICT OF ARIZONA

9

10    United States of America,              )    CR 12-583-TUC-DCB (CRP)
                                             )
11            Plaintiff,                      )    **REPORT & RECOMMENDATION**
                                             )
12    vs.                                     )
                                             )
13                                            )
      Brigido Luna Zapien,                    )
14                                            )
              Defendant.                      )
15                                            )
                                             )
16    _____)

17         Defendant Luna Zapien has filed a Motion to Suppress Evidence and Statements for

18    Fourth Amendment Violation (Doc. 147) and a Motion to Suppress Statements and Evidence

19    for *Miranda* Violation and for Involuntariness (Doc. 148), wherein he argues that his arrest

20    was without probable cause and that his statements must be suppressed because they were

21    made after he invoked his right to counsel.  The Government has filed a Response to

22    Defendant's Motion to Suppress Statements and Evidence for Fourth Amendment Violation

23    (Doc. 149), and both parties submitted supplemental briefing after the October 1, 2013

24    evidentiary hearing on Defendant Luna Zapien's Motions.  (*See* Docs. 156, 157). The day

25    before the evidentiary hearing, Defendant Luna Zapien filed a Motion to Compel Disclosure

26    of Impeachment Evidence Re: Confidential Informer (Doc. 150). After consideration of the

27    testimony presented, exhibits admitted into evidence and argument of respective counsel, the

28    Magistrate Judge recommends that the District Court, after its independent review: (1) deny

1   Defendant's Motion to Suppress Evidence and Statements for Fourth Amendment Violation

2   (Doc. 147); (2) deny Defendant's Motion to Suppress Statements and Evidence for *Miranda*

3   Violation and for Involuntariness (Doc. 148); and (3) deny without prejudice Defendant's

4   Motion to Compel Disclosure of Impeachment Evidence RE: Confidential Informer (Doc.

5   150).

6   **INDICTMENT**

7         Defendant Luna Zapien is charged with having: from a time unknown to on or about

8   February 10, 2012, at or near Sahuarita in the District of Arizona, knowingly and

9   intentionally combining, conspiring, confederating, and agreeing together with other person

10  known and unknown, to possess with intent to distribute 500 grams or more of a mixture or

11  substance containing a detectable amount of methamphetamine, or 50 grams or more of

12  actual methamphetamine, that is approximately 450 grams of methamphetamine, a Schedule

13  II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)A)(viii), all in violation

14  of 21 U.S.C. § 846 (count 1); and on or about February 10, 2012, at or near Sahuarita, in the

15  District of Arizona, knowingly and intentionally possessing with intent to distribute 500

16  grams or more of a mixture or substance containing a detectable amount of

17  methamphetamine, or 50 grams or more of actual methamphetamine, that is approximately

18  450 grams of methamphetamine, a Schedule II controlled substance, in violation of 21

19  U.S.C. § 841(a)(1), (b)(1)(A)(viii) (count 2). (Doc. 13).

20  **TESTIMONY**

21        At the October 1, 2013 evidentiary hearing, the following witnesses testified, all on

22  behalf of the Government:   DEA Agent Jerome Souza ("Agent Souza"), who has been with

23  the DEA for three years (Transcript (Doc. 158), pp. 7-8); Sahuarita Police Officer Carlos

24  Navarrete, who has been with the Sahuarita Police Department ("SPD") approximately 10

25  years and who was assigned to the Counter-Narcotic Alliance on the date of Defendant Luna

26  Zapien's arrest (*Id.* at p. 98); and Nogales Police Officer Mark Ramirez ("TFO Ramirez"),

27  who has been with the Nogales Police Department for 16 years, and who for the past ten

28  years has been assigned to the DEA as a Task Force Officer.  (*Id.* at pp. 122-23, 141).

1    DEA's investigation leading to Defendant Luna Zapien's February 10, 2012 arrest at

2    issue in this case began about one month earlier, when an informant advised DEA "that

3    [Defendant] Luna Zapien was a drug dealer." (*Id.* at pp. 9, 38). The purpose of the

4    investigation "was to dismantle a drug trafficking organization..." involving cocaine and

5    methamphetamine that was based out of Sahuarita, Arizona, at the time. (*Id.* at p.9). Prior

6    to receiving information from the informant, Agent Souza had no information about

7    Defendant Luna Zapien. (*Id.* at p. 38). During the investigation, DEA learned Defendant

8    Luna Zapien's full name, vehicle description (a tan Ford F-150 truck), license plate number

9    and telephone number. (*Id.* at pp. 9-11, 14, 18, 100). On January 25, 2012, an undercover

10   agent called Defendant Luna Zapien and discussed a future sale of cocaine wherein

11   Defendant Luna Zapien indicated he could supply multi-kilograms of cocaine. (*Id.* at pp. 11,

12   41). Agent Souza was not sure whether Defendant Luna Zapien mentioned a specific price

13   during that conversation and the conversation was not recorded. (*Id.* at pp. 10-11, 39-41; *see*

14   *also id.* at p. 39 (whether to record the conversation was within Agent Souza's discretion)).

15   It was agreed during the conversation that Defendant Luna Zapien and the undercover agent

16   would meet within a week of the phone call. (*Id.* at p. 12). That meeting occurred at a

17   Denny's in Tucson between Defendant Luna Zapien and a Confidential Source ("CS" or "the

18   source") who was "vetted and reliable and truthful." (*Id.* at pp. 11-12). The two discussed

19   "the future sale of...cocaine and methamphetamine" and the price of same. (*Id.* at p.13 ("the

20   amounts and the cost per kilo was [sic] then relayed through the source to..." the DEA.)).

21   Thereafter, DEA obtained, by warrant, a GPS for Defendant Luna Zapien's truck. (*Id.* at pp.

22   13-14).

23       Agent Souza is not certain how many conversations the CS had with Defendant Luna

24   Zapien prior to February 10, 2012, and there are no written records of such conversations.

25   (*Id.* at pp. 45-46, 48).

26       On February 10, 2012, the CS contacted Defendant Luna Zapien and agreed to meet

27   with him in the early afternoon at a Subway parking lot in Sahuarita, Arizona. (*Id.* at p. 14).

28   Prior to the meeting, the CS and his vehicle were searched for contraband and he was

provided with $9,000, the serial numbers of which had been recorded. (*Id.* at pp. 18-19). The CS and Defendant Luna Zapien met as arranged. (*Id.* at p. 15). During the meeting, they were under constant surveillance by multiple agents and aerial surveillance, but agents could not hear what was being said or see what was happening inside the vehicle. (*Id.; see also id.* at pp. 125-26, 145 (TFO Ramirez personally observed the meeting between Defendant Luna Zapien and the CS)). During the meeting, Defendant Luna Zapien entered the CS's vehicle where he stayed for "[a] few minutes" before exiting, getting into his own vehicle and leaving the parking lot. (*Id.* at pp. 15-16). Thereafter, the CS reported to agents over the telephone that "the defendant offered to sell the source a multi-gram quantity of methamphetamine. The source tells the defendant that that's not what he/she came here for. And the defendant tells the source that he's going to leave and come back with a different amount for he/she to purchase." (*Id.* at p.16 (*see also id.* at p. 15 (at the meeting Defendant Luna Zapien had "a multi-gram quantity of methamphetamine at that time to sell to the source.")). The CS did not wear a recording device during this meeting. (*Id.* at p. 59).

For safety reasons, after Defendant Luna Zapien drove out of the parking lot, agents directed the CS who remained under constant surveillance to leave the area. (*Id.* at pp. 126, 147). The CS called Defendant Luna Zapien to say he "left because [he] needed to do something...to make sure if the defendant returned and didn't find him, that he wasn't alarmed...."[1] (*Id.* at pp. 126-27).

When Defendant Luna Zapien left the parking lot, he was followed by agents to a house located on La Villita in Sahuarita, Arizona, where he met with co-defendants Joseph Bojorquez and Carmelo Avila Rivera. (*Id.* at pp. 16-17; *see also* (TR. p. 18 (the residence was about one and one half miles away from the Subway parking lot)). Surveilling officers saw a maroon minivan at the residence. (*Id.* at p. 17). Soon thereafter, Defendant Luna

---

[1]Contrary to TFO Ramirez's account, Agent Souza testified that the CS remained at the Subway parking lot the entire time Defendant Luna Zapien was gone. (TR. p. 54). The Court finds this discrepancy is immaterial and the Court is satisfied that the CS left the site and returned.

1   Zapien left the residence in his truck and, followed by the minivan, returned to the Subway
2   parking lot. (*Id.* at p. 18). At some point, Defendant Luna Zapien contacted the CS to let him
3   know he should return to the Subway, which the CS did while under constant surveillance.
4   (*Id.* at p. 127). At the parking lot, where all remained under surveillance, Defendant Luna
5   Zapien and the CS left their vehicles and entered the minivan, where they remained for a few
6   minutes. (*Id.* at pp. 18, 20).   Agent Souza testified that the CS told him that during the
7   meeting in the minivan, Defendant Bojorquez removed methamphetamine from a cooler,
8   handed it to Defendant Luna Zapien who handed it to the CS with a scale. (*Id.* at pp. 20, 59-
9   60). The CS weighed the drugs at Defendant Luna Zapien's direction and determined that
10  the weight was "[a]pproximately one-half pound." (*Id.* at pp. 20-21). The CS gave the
11  $9,000 to both Defendant Bojorquez and Defendant Avila Rivera who counted it. (*Id.* at p.
12  21). After the money was counted, Defendant Luna Zapien and the CS left the minivan,
13  returned to their respective vehicles, and left the parking lot. (*Id.*). There were no cameras
14  in the minivan. (*Id.* at p. 63).

15  After the meeting, the CS, without making any stops and while under surveillance,
16  drove to a location where he met with agents to give them the narcotics, which TFO Ramirez
17  recognized as methamphetamine. (*Id.* at pp. 23, 128). A search of the CS and his car showed
18  no other drugs were in his possession and he no longer had the $9,000. (*Id.* at pp. 23).

19  Later that same day, the CS, in the presence of agents, had further phone contact with
20  Defendant Luna Zapien to arrange for "a second purchase of methamphetamine from Mr.
21  Luna Zapien." (*Id.* at p. 24; *see also id.* ("Multiple phone calls were made– ");
22  Government's Exh. 1 (transcripts of recorded telephone calls made on February 10, 2012 at
23  4:08 p.m., 5:19 p.m. and 5:29 p.m. between Defendant Luna Zapien and the CS); *see also*
24  TR., pp. 46-47). They discussed the purchase of an additional "half-kilogram"[2] of
25  methamphetamine for $13,500, and agreed to meet at 7:00 p.m. at a McDonald's near the
26  same area of the Subway where they had met earlier. (*Id.* at pp. 26-27, 30, 70).

27  ────────────────

28  [2]Agent Souza also referred to "a half-pound" of methamphetamine. (TR. p. 26, l.5).

1   Prior to the meeting between Defendant Luna Zapien and the CS, law enforcement

2 had a "pre-operational meeting" at 6:00 p.m. where "all agents, local law enforcement,

3 anybody involved on the street and the area, meets and discuss the events that will take place

4 in the near future that day. The targets' names are given, vehicle descriptions, license plates,

5 locations, and everybody becomes in sync of...what was to happen." (*Id*. at pp. 27-29). At

6 the pre-operational meeting, Defendant Luna Zapien was identified as a target, his name,

7 vehicle description and license plate number were provided to all agents at the meeting, as

8 well as the details concerning the meeting between Defendant Luna Zapien and the CS and

9 sale of narcotics earlier that day. (*Id*. at p. 28-29; *see also id*. at pp. 100-03, 111 (Officer

10 Navarrete confirmed he received this information together with a description of the minivan,

11 and he was shown a photograph of Defendant Luna Zapien)). Officer Navarrete attended the

12 pre-operational meeting where he learned that "they would be meeting a male subject by the

13 name of Brigido Zapien, who would be selling a confidential source a large amount of

14 methamphetamine at our local McDonald's located off Sahuarita Road." (*Id*. at p. 99). He

15 also "recall[ed] being informed...that they had PC, too." (*Id*. at p. 110).

16   Surveillance was set up at the McDonald's. (*Id*. at 30). Defendant Luna Zapien

17 arrived before the CS. (*Id*. at pp. 31, 131).

18   Surveillance revealed that the maroon minivan was en route from the La Villita

19 residence to the McDonald's. (*Id*. at p.31). It "pulled into the McDonald's and drove into

20 the Shell station, which is adjacent to the parking lot, and continued through the Shell station,

21 and then proceeded north on Rancho Sahuarita Boulevard." (*Id*. at p. 32). Local law

22 enforcement, who were in radio contact with DEA and had been able to monitor all

23 conversations between the DEA agents, were asked to stop the minivan. (*Id.*; *see also id.* at

24 p. 101 (Officer Navarrete "monitor[ed] the operation via DEA hand-held radio..." provided

25 to him during the pre-operational meeting)). The minivan was stopped by Officer Navarrete,

26 who was driving a marked police vehicle, about a tenth of a mile from the McDonald's after

27 another agent informed him "over the radio that the van did commit a lane violation." (*Id*.

28 at pp. 101, 103). After stopping the minivan, Officer Navarrete was joined by Sergeant

1  Zamora.  (*Id.* at p. 103).

2       Meanwhile, Defendant Luna Zapien left the McDonald's in his truck, headed in the

3  same direction that the minivan had driven, ultimately passing the minivan that by this time

4  had been stopped by marked patrol vehicles. (*Id.* at p. 34).   Thereafter, Defendant Luna

5  Zapien drove into a parking lot and drove out of that parking lot onto Sahuarita Road toward

6  his residence.  (*Id.*).  Soon thereafter, at approximately 7:30 p.m., Officer Navarrete stopped

7  Defendant Luna Zapien's truck.  (*Id.* at pp. 34-35).  Officer Navarrete stopped Defendant

8  Luna Zapien's truck because other agents instructed him to do so; he did not hear over the

9  radio that Defendant Luna Zapien committed any traffic violation.  (*Id.* at p. 113).  Officer

10  Navarrete testified that the man he stopped in the tan F-150 matched the description and

11  photo of Defendant Luna Zapien.  (*Id.* at p. 104).

12       Later, after Defendant Luna Zapien had been stopped and while he remained detained

13  on  the road with his truck, a search warrant was executed at the La Villita address.  (*Id.* at

14  p. 105).  Additionally, a canine search of the minivan led to the discovery of a "large quantity

15  of methamphetamine...within that van."  (*Id.* at p. 106).

16       Defendant Luna Zapien was detained at the location where he had been stopped for

17  about twenty to thirty minutes until Officer Navarrete transported him to the SPD.  (*Id.* at pp.

18  106, 117).  At the station, Officer Navarrete handed Defendant Luna Zapien over to other

19  agents.  (*Id.* at pp. 118).  The Sahuarita Police Station has multiple interview rooms, some

20  of which have recording devices, and Officer Navarrete told the agents about these room as

21  well as where they could get some water and coffee.  (*Id.* at pp. 118-19 ("Three [rooms] had

22  recording; one didn't.")).  Officer Navarrete testified that there is a hallway that leads to the

23  interview rooms which "is  still within the holding cell area, it's just behind a wall that

24  essentially people who are in the holding cells can't see you; however, they can be within

25  earshot of you."  (*Id.* at p. 119; *see id.* (Officer Navarrete agreed that in this area people in

26  the holding cells  "can hear you, but they can't see you.")).  When Officer Navarrete arrived

27  "with Mr. [Luna]-Zapien..." the other people whom Officer Navarrete had stopped, were in

28  the holding cells.  (*Id.* at pp. 119-20).

1      Sometime between 9:00 p.m. to 9:30 p.m., Agent Souza, along with TFO Ramirez and

2   Special Agent Erika Dorado approached Defendant Luna Zapien to interview him.  (*Id.* at

3   pp. 35-36, 135; *see also id.* at pp. 134, 154 (TFO Ramirez testified that the actual contact was

4   made at approximately 9:25 p.m.)).  When questioning began, Defendant Luna Zapien had

5   been detained at the SPD for less than one hour.  (*Id.* at p. 135).  TFO Ramirez testified that

6   there were only two holding cells and Defendant Luna Zapien was held in the hallway area

7   which TFO Ramirez referred to as a "sally port."  (*Id.* at pp. 155-56).  They questioned

8   Defendant Luna Zapien in the hallway area behind the holding cells.  (*Id.* at pp. 36, 78, 134-

9   35, 157-58).  That area looked like a processing room with a couple of tables.  (*Id.* at p. 156).

10  TFO Ramirez testified they interviewed the defendants away from the holding cells and that

11  the other defendants "were inside rooms with doors that was [sic] separated from...that

12  hallway[]" where Defendant Luna Zapien was questioned.  (*Id.* at p.158 (TFO Ramirez

13  denied that the wall between the holding cells and the hallway were partial or incomplete)).

14  On cross-examination, TFO Ramirez testified that he did not know whether the other

15  defendants could hear the interview because he was not inside a holding cell.  (*Id.* at p. 158).

16  However, after stating that the co-defendants in holding cells were separated from the

17  hallway, he testified that they could not hear the interview with Defendant Luna Zapien.

18  (*Id.*).  Officer Navarrete, who did not participate in questioning Defendant Luna Zapien,

19  testified that he told the agents, "if you want to do it at a different location, I have other

20  rooms available to you."  (*Id.* at pp. 120-21).  TFO Ramirez, who had never worked at the

21  SPD prior to this incident, testified that after taking Defendant Luna Zapien's statement, he

22  was informed that there were interview rooms, and he used those rooms to interview the

23  other two defendants.  (*Id.* at pp. 134-35, 142, 157).

24      Because Agent Souza did not speak Spanish, TFO Ramirez, a Spanish speaker,

25  initiated the questioning of Defendant Luna Zapien who did not speak English.  (*Id.* at pp.

26  135-36, 147; *see also id* at pp. 160-61 (TFO Ramirez "was getting questions from Agent

27  Dorado [who spoke Spanish] and Agent Souza to ask the defendant.")).    Prior to

28  questioning, TFO Ramirez read to Defendant Luna Zapien his *Miranda* rights in Spanish

1    from a plastic wallet card.  (*Id.* at pp. 136-37).  TFO Ramirez did not have a form for

2    Defendant Luna Zapien to sign to indicate he waived his rights, nor did TFO Ramirez ask

3    for such a form.  (*Id.* at pp. 136, 160).  Agent Souza testified that neither he nor Agent

4    Dorado nor the other agents had the form DEA uses to advise of *Miranda* rights.  (*Id.* at p.

5    76).

6         After being informed of his *Miranda* rights, Defendant Luna Zapien indicated he

7    understood his rights and that he was willing to speak with the officers without an attorney.

8    (*Id.* at p. 137).  When asked about his involvement in narcotics trafficking, Defendant Luna

9    Zapien denied any involvement in the sale or purchasing of narcotics.  (*Id.*).  TFO Ramirez

10    then informed Defendant Luna Zapien that "I had information and evidence that he was

11    involved," and at that point Defendant Luna Zapien informed he would not answer further

12    questions without the presence of an attorney and the interview was terminated.  (*Id.* at p.

13    138).  Defendant Luna Zapien invoked his right to counsel five minutes after questioning had

14    begun.  (*Id.* at pp. 82-83).

15         At some point after Defendant Luna Zapien requested an attorney, TFO Ramirez

16    stated that he "needed to get some biographical information" for DEA Form 202, which

17    requires information such as name, birth date, residence, "his wife, parents...if he has kids."

18    (*Id.* at pp. 138-39).  About this exchange, TFO Ramirez testified as follows:

19             Q [Prosecutor:]    Okay. And Did he voluntarily agree to do that?

                A [TFO Ramirez:]  Yes, sir.

20             Q                    Did you tell him he had to do that?

                A                    Yes, sir.

21             Q                    You told him he had to give you biographical

                                      information–

22             A                    I told him–

                Q                    –or you requested it?

23             A                    No, no.  I requested the–biographical information, but I

                                      made sure I told him this–I wasn't going to ask him any

24                                      questions about the case, about the evidence or nothing.

                                      It was just questions that we needed...to fill out the form,

25                                      nothing–

26    (*Id.* at p. 139).  On cross-examination, TFO Ramirez denied that he told Defendant Luna

27    Zapien that "he had to answer those questions." (*Id.* at p. 165).  Agent Souza indicated in his

28    report that TFO Ramirez told Defendant Luna Zapien  that he would be "required" to answer

the biographical questions from DEA Form 202.  (*Id.* at pp. 84, 86).

TFO Ramirez testified that he asked Defendant Luna Zapien the biographical questions and, in turn, translated the answers to Agent Souza who recorded the information on DEA Form 202. (*Id.* at p. 163-64).  TFO Ramirez testified on cross-examination that he already knew information from Defendant Luna Zapien's driver's license, including address, but he still asked such questions for DEA Form 202, because the information can change. (*Id.* at pp. 163-64, 166, 169).  He also testified that he never fills out DEA Form 202 at the beginning of an interview.  (*Id.* at p. 166).

When questioned further about the DEA Form 202 on cross-examination, TFO Ramirez testified:

| Q [Defense Counsel:] | And you say that you asked him questions about who is wife was, how many children he had, what their names were, et cetera, et, cetera, correct? |
|---|---|
| A [TFO Ramirez:] | Yes, sir. |
| Q | And Agent Souza was filling that out on a DEA From 202[?] |
| A | Yes, sir. |

(*Id.* at p. 164). Although the DEA Form 202 submitted by the parties with their supplemental briefs provides space specifically for this family information, those spaces are blank on Defendant Luna Zapien's form. (*See* Doc. 156, Att. 5; Doc. 157, Exh. A).  Though, other biographical information is recorded on the form. (*Id.*).

Agent Souza testified that he did not fill out the DEA Form 202 because the questions and answers were in Spanish; instead, TFO Ramirez completed it. (*Id.* at p.93). DEA  Form 202 was submitted and signed by Lisa E. Gaul and Agent Souza. (Doc. 156, Att. 5; Doc. 157, Exh. A).

TFO Ramirez testified that at some point after providing biographical information, Defendant Luna Zapien, through his own initiation, indicated he wanted to give a statement regarding his narcotics trafficking conduct. (*Id.* at pp. 139-40, 170). TFO Ramirez reminded Defendant Luna Zapien of his constitutional rights that had been read previously and told him that the officers did not want to ask him any questions because he said he wanted an attorney (*Id.* at pp. 140, 170). TFO Ramirez testified that  Defendant Luna Zapien indicated

1  he understood those rights, he wanted to waive them, and he wished "to speak to us without

2  the presence of an attorney." (*Id.* at p. 170; *see also id.* at p. 140).  TFO Ramirez then asked

3  Defendant Luna Zapien about his participation in narcotics activity and Defendant Luna

4  Zapien admitted his involvement "in making phone calls and meeting with an unknown

5  hispanic male, and that he did sell narcotics." (*Id.* at p.140).

6       During the questioning, which occurred in Spanish, Defendant Luna Zapien was not

7  handcuffed and  he was able to sit down. (*Id.* at pp. 96, 135, 140).  Defendant Luna Zapien

8  was not threatened, nor was he promised anything in exchange for giving a statement. (*Id.*

9  at pp. 140-41).  All questioning finished at 10:00 p.m. (*Id.* at p. 168).  There was no break

10  in questioning from the start at approximately 9:25 p.m. to finish at 10:00 p.m. (*Id.*; *see also*

11  *id.* at p. 85 (there was no break between the time when Defendant Luna Zapien requested

12  counsel and when TFO Ramirez commenced biographical questions)).

13  **DISCUSSION**

14       **Probable Cause**

15       Defendant Luna Zapien argues that all evidence and statements must be suppressed

16  because the stop of his truck conducted by Officer Navarrete at 7:30 p.m. was without

17  probable cause. (Doc. 147).  Defendant Luna Zapien points out that no drugs were found in

18  his vehicle, nor does Officer Navarrete cite a traffic violation as reason for the stop. (Doc.

19  147).  He also points out that agents relied solely on information provided by the CS about

20  Defendant Luna Zapien's alleged role, actions and statements during the meeting. (Doc.

21  157).  According to Defendant Luna Zapien, the Court's failure to require disclosure of

22  information about the CS impaired his  ability to cross-examine witnesses at the evidentiary

23  hearing. (*Id.*).

24       Police stops involving full-scale arrests, like that of Defendant Luna Zapien in this

25  case, must be supported by probable cause. *Morgan v. Woessner,* 997 F.2d 1244, 1252 (9th

26  Cir. 1993) (*citing Adams v. Williams,* 407 U.S. 143, 148-49 (1972)).  Probable cause exists

27  when "'the facts and circumstances within the knowledge of the arresting officers and of

28  which they had reasonably trustworthy information were sufficient to warrant a prudent man

1   in believing that the [defendant] had committed or was committing an offense.'"   *United*

2   *States v. Jensen,* 425 F.3d 698, 704 (9th Cir. 2005) (*quoting United States v. Bernard*, 623

3   F.2d 551, 559 (1980)); *see also  United States v. Garza,* 980 F.2d 546, 550 (9th Cir. 1992).

4    "A determination as to whether probable cause exists requires a 'practical, common-sense'

5   decision based on the totality of the circumstances, including the veracity, basis of

6   knowledge and reliability of the information provided by informants." *Jensen,* 425 F.3d at

7   704.  Moreover, "'[w]here law enforcement authorities are cooperating in an investigation

8   [], the knowledge of one is presumed shared by all.'"  *Id.* (*quoting Illinois v. Andreas,* 463

9   U.S. 765, 772 n.5 (1983)).  Under the collective knowledge doctrine, "[w]here one officer

10  knows facts constituting reasonable suspicion or probable cause (sufficient to justify action

11  under an exception to the warrant requirement), and he communicates an appropriate order

12  or request, another officer may conduct a warrantless stop, search, or arrest without violating

13  the Fourth Amendment." *United States v. Ramirez,* 473 F.3d 1026 (9th Cir. 2007).  The

14  collective knowledge doctrine does not include a requirement regarding the content of the

15  communication that one officer must make to another. *Id.*

16          After being informed by the CS that Defendant Luna Zapien agreed to meet him at a

17  Subway parking lot to sell him drugs, DEA agents observed Defendant Luna Zapien meet

18  with the CS as arranged.  After learning from the CS that Defendant Luna Zapien did not

19  have the quantity of drugs with him at the time that the CS had requested, Defendant Luna

20  Zapien indicated he would return with a different amount of drugs.  Consistent with that

21  information, agents observed Defendant Luna Zapien leave the Subway parking lot, travel

22  to the residence where the maroon minivan was located and where he met with co-defendants

23  Bojorquez and Rivera Avila.  He then  returned to the Subway parking lot followed by the

24  minivan.  There, agents observed Defendant Luna Zapien and the CS meet and enter the

25  minivan where the CS reported he received narcotics in exchange for $9,000.  The CS, who

26  had been under constant surveillance, handed the drugs over to the agents.  Transcripts of

27  phone calls occurring later that same day between the CS and Defendant Luna Zapien reflect

28  that the two discussed the sale of an additional amount of drugs, with Defendant Luna Zapien

1  stating: "How can I say [it]?  Uh-a half of filet, half a kilo [quilate] of filet.  (Exh. 1, p. 1).

2  The conversation continued:

3      [CS:]              A half of filet?  And you/he can't complete it for me with
                          coke from others?
4      [Luna Zapien:]     ...It's just that I told him that I needed to talk with
                          the...chief.  Uh-But if you want, right now-right now I'll
5                         call him [UI] a half kilo of fish.

6  (*Id.* at pp. 1-2).  Later, Defendant Luna Zapien stated: "You already know, it's twenty-five

7  (25) bills each filet."  (*Id.* at p. 4; *see also id.* at p.10 (Defendant Luna Zapien stating: "The

8  money that I told you, about the 13[,]500, bring it for the-for the half kilo of–of fish")).

9      Thereafter, the CS informed agents that he and Defendant Luna Zapien arranged to

10 meet at McDonald's at approximately 7:00 p.m. for the latest transaction.  Agents observed

11 Defendant Luna Zapien arrive at the McDonald's at approximately 7:00 p.m.  Meanwhile,

12 agents observed the minivan driving in the direction of the McDonald's.

13     Defendant Luna Zapien challenges the agents' reliance on information from the CS

14 in light of the lack of disclosure about the CS.  Aside from Agent Souza's conclusory

15 statement that the CS is reliable and truthful (TR. at pp. 10-11), the evidence shows that

16 Defendant Luna Zapien's movements were consistent with information the CS provided.

17 Defendant Luna Zapien was where the CS said he would be for each pre-arranged meeting.

18 Defendant Luna Zapien went to the residence where the minivan was located, was followed

19 back to the Subway by the minivan, and the CS had narcotics in his possession after meeting

20 with Defendant Luna Zapien and the other occupants inside the minivan. Further, although

21 not all conversations between Defendant Luna Zapien and the CS were recorded, those that

22 were support the conclusion that Defendant Luna Zapien was setting up and participating in

23 the sale of narcotics to the CS.  In light of the testimony, including the observations of agents

24 who kept Defendant Luna Zapien and the CS under constant surveillance as events unfolded

25 on February 10, 2012, the Government has established probable cause to believe that

26 Defendant Luna Zapien was involved in narcotics trafficking on that date and Officer

27 Navarrete's stop of Defendant Luna Zapien was proper under the collective knowledge

28 doctrine.  Consequently, Defendant Luna Zapien's Motion to Suppress Statements and

1    Evidence for Fourth Amendment Violation should be denied.

2         **Statements**

3         "[T]he Supreme Court [has] held that *Miranda* established that 'when an accused has

4    invoked his right to have counsel present,' he 'is not subject to further interrogation by

5    authorities until counsel has been made available to him, unless the accused himself initiates

6    further communication, exchanges, or conversations with the police.'" *United States v.*

7    *Foster,* 227 F.3d 1096, 1103 (9th Cir. 2000) (*quoting Edwards v. Arizona,* 451 U.S. 477, 484-

8    85 (1981)).  "Moreover, even if an accused initiates further communication, a *Miranda*

9    violation might occur if interrogation ensues." *Id.*

10        There is no dispute Defendant Luna Zapien invoked his right to counsel before

11   making the statements at issue.  The testimony supports the conclusion that there was no

12   significant, if any, break between Defendant Luna Zapien's request for counsel and TFO

13   Ramirez's commencement of questioning for purposes of DEA Form 202.  Agent Souza

14   testified that TFO Ramirez informed Defendant Luna Zapien that he was "required" to

15   answer the biographical questions.  TFO Ramirez's initial testimony is consistent with Agent

16   Souza's recollection; however upon further questioning by the Government as to whether he

17   told Defendant Luna Zapien that "he had to" provide the biographical information or whether

18   TFO Ramirez "requested" he provide the information, TFO Ramirez revised his testimony

19   to indicate that he "requested" that Defendant Luna Zapien answer the biographical

20   questions.  (*See* TR. at p. 139).

21        Regardless whether TFO Ramirez "required" or "requested" Defendant Luna Zapien

22   to provide the biographical information, the Ninth Circuit has recognized that generally,

23   "[r]outine gathering of background biographical data does not constitute interrogation...."

24   *United States v. Perez,* 776 F.2d 797, 799 (9th Cir. 1985), *overruled on other grounds by*

25   *United States v. Cabaccang,* 332 F.3d 622, 634-35 (9th Cir. 2003); *see also United States v.*

26   *Washington,* 462  F.3d 1124, 1132 (9th Cir. 2005); *United States v. Booth,* 669 F.2d 1231,

27   1238 (9th Cir. 1981); *United States v. Hughes,* 921 F.Supp. 656 (D.Ariz. 1996) (biographical

28   questioning after invocation of right to counsel did not violate *Edwards*).  However, the law

1   is clear that "[w]ithout obtaining a waiver of the suspect's *Miranda* rights, the police may not

2   ask questions, even during booking, that are designed to elicit incriminatory admissions."

3   *Pennsylvania v. Muniz,* 496 U.S. 582, 602 n. 14 (1990).  *See also Untied States v. Mata-*

4   *Abundiz,* 717 F.2d 1277, 1280 (9th Cir. 1983); *Booth,* 669 F.2d at 1238 (recognizing "the

5   potential for abuse by law enforcement officers who might, under the guise of seeking

6   'objective' or 'neutral' information, deliberately elicit an incriminating statement from a

7   suspect."); *United States v. Hernandez-Ruiz,* 808 F.Supp. 717, 718 (D.Ariz. 1992)

8   ("Biographical information obtained from a defendant following invocation of his *Miranda*

9   rights may constitute interrogation for purposes of *Miranda* when that information relates

10  directly to the elements of the crime with which the defendant is charged.").  "Thus, even

11  with regard to biographical data, a court must determine, in light of all the circumstances,

12  whether such questioning was reasonably likely to elicit an incriminating response.  The

13  degree to which questions are routine or are unrelated to the crime are factors to be

14  considered in making the determination." *Hughes,* 921 F.Supp. at 658 (*citing Booth,* 669

15  F.2d at 1238).  "The test is objective.  The subjective intent of the agent is relevant but not

16  conclusive....The relationship of the question asked to the crime suspected is highly

17  relevant." *Mata-Abundiz,* 717 F.2d at 1280 (citation omitted) (suppressing statements where

18  questions  were reasonably likely to elicit incriminating information and the questions had

19  little resemblance to routine booking procedure).

20          Here, after Defendant Luna Zapien invoked his right to counsel, and prior to his

21  reconsideration of the invocation, TFO Ramirez asked him only non-incriminating

22  biographical questions.  There is no indication that the words or actions used by TFO

23  Ramirez or the other agents present were "such that the agents should have known that they

24  would be reasonably likely to elicit an incriminating response from the defendant." *Hughes,*

25  921 F.Supp. at 658.  Nor is there evidence that the questioning limited to DEA Form 202

26  elicited any incriminating response.  Consequently, such questioning did not constitute

27  "interrogation."  *See id.*  "Nor does the fact that the defendant asked...[for] an attorney prior

28  to being asked  biographical questions  convert  such  questioning  into  impermissible

interrogation."  *Id. (citing Gladden v. Roach,* 864 F.2d 1196, 1198 (5th Cir. 1989) (finding

that an arrested defendant who has invoked his *Miranda* rights does not have "an absolute

right to remain silent" and may be asked biographical questions for booking purposes)).

Contrary to Defendant Luna Zapien's assertion otherwise (*See* Doc. 148, p. 6), under the

instant circumstances he  was not subjected to further interrogation as contemplated by

*Miranda* when he was asked biographical questions for purposes of completing DEA Form

202.  *See id.* at 659 (*citing Edwards*, 451 U.S. 477).

At some point during or after the biographical questions required by DEA Form 202,

Defendant Luna Zapien indicated he wished to speak to TFO Ramirez about his activity in

narcotics trafficking.  "[E]ven if a conversation taking place after the accused has 'expressed

his desire to deal with the police only through counsel,' is initiated by the accused, where

reinterrogation follows, the burden remains upon the prosecution to show that subsequent

events indicated  a waiver of the Fifth Amendment right to have counsel present during the

interrogation."  *Oregon v. Bradshaw,* 462 U.S. 1039, 1044-45 (1983) (recognizing that the

inquiry whether a defendant initiated a conversation with law enforcement is distinct from

the inquiry whether the defendant waived the previously asserted right to counsel).  Thus,

where the defendant initiates further communication, exchanges or conversations with law

enforcement, *ie* "evinc[es] a willingness and a desire for a generalized discussion about the

investigation...", then the question turns to "'whether a valid waiver of the right to counsel

and the right to silence had occurred, that is, whether the purported waiver was knowing and

intelligent and found to be so under the totality of the circumstances, including the necessary

fact that the accused, not the police reopened the dialogue with the authorities.'" *Id.* (*quoting*

*Edwards,* 451 U.S. at 486 n. 9); *see also Brewer v. Williams,* 430 U.S. 387, 404 ("waiver

requires not merely comprehension but relinquishment...."). The Government also points to

factors considered under 18 U.S.C. § 3501 when determining voluntariness: (1) the time

elapsing between arrest and arraignment; (2) whether the defendant knew the nature of the

offense with which he was charged or suspected; (3) whether the defendant was advised or

knew that he was not required to make any statement and that statement could be used

1    against him; (4) whether the defendant had been advised prior to questioning of his right to

2    counsel; and (5) whether defendant was without assistance of counsel when questioned and

3    when giving such confession.  (Doc. 156, p. 8).  The Government must demonstrate by a

4    preponderance of the evidence that "'the defendant knowingly and intelligently waived his

5    privilege against self-incrimination and his right to retained or appointed counsel.'" *Berghus*

6    *v. Thompkins,* 560 U.S. 370, __, 130 S.Ct. 2250, 2261 (2010) (*quoting Miranda v. Arizona,*

7    384 U.S. 436, (1966)); *Colorado v. Connolley,* 479 U.S. 157, 168 (1986).

8        The evidence presented is that Defendant Luna Zapien was properly advised of his

9    rights in Spanish, his native language.  There is no basis to conclude that Defendant Luna

10   Zapien did not understand those rights, especially given that he initially invoked his right to

11   counsel and questioning concerning narcotics trafficking ceased.  Although TFO Ramirez

12   then started asking biographical questions instead, such questioning did not constitute

13   interrogation, *see* discussion *supra,* and TFO Ramirez testified that he told Defendant Luna

14   Zapien that he was not going to ask "about the case, about the evidence....It was just

15   questions that we needed...to fill out the form...."  (TR. p. 139).  Further, Defendant Luna

16   Zapien was reminded of his rights when, after invoking his right to counsel, he later of his

17   own volition told TFO Ramirez that he wanted to waive those rights and give a statement

18   without the presence of an attorney regarding his narcotics trafficking activity. Moreover,

19   TFO Ramirez also informed Defendant Luna Zapien that the officers did not want to ask him

20   questions because he said he wanted an attorney.  In sum, the record demonstrates that

21   Defendant Luna Zapien waived his right to counsel given that after invoking his right to

22   counsel, he evinced a willingness to talk about his narcotics trafficking activity, was

23   reminded of his rights under *Miranda,* was informed of officers' reluctance to discuss the

24   narcotics trafficking investigation in light of his request for counsel, stated that he understood

25   those rights and that he wanted to now waive them to speak with TFO Ramirez without the

26   presence of counsel. *Compare Brewer,* 430 U.S. at 405 (after right to counsel invoked, no

27   subsequent waiver shown where detective elicited incriminating statements without telling

28   defendant "he had a right to the presence of a lawyer, and made no effort at all to ascertain

1   whether [defendant] wished to relinquish that right.").

2   Further, there is no evidence of coercion.  The evidence presented is that the agents

3   made no threats, promises or inducements to talk.  Although questioning occurred in a

4   hallway area instead of an interview room, both Agent Souza and TFO Ramirez testified that

5   there were tables and chairs available, Defendant Luna Zapien was not handcuffed, and he

6   was seated.[3]  Although Officer Navarrete testified that co-defendants in the holding cells

7   could hear conversations occurring in the hallway where Defendant Luna Zapien was

8   questioned, TFO Ramirez denied this.  Nor is there evidence that Defendant Luna Zapien

9   was aware co-defendants may overhear his conversation.  Additionally, TFO Ramirez

10  testified that he did not learn that interview rooms were available until after he had

11  questioned Defendant Luna Zapien.  Although it would be preferable that such interviews

12  were recorded so as to allay any later concerns regarding issues such as voluntariness, the

13  Ninth Circuit does not require it.  *See United States v. Smith-Balthier,* 424 F.3d 913, 925-25

14  & n.10 (reaffirming *United States v. Coades,* 549 F.2d 1303, 1305 (9th Cir. 1977)).  The

15  evidence of record negates any argument that Defendant Luna Zapien's waiver of his right

16  to counsel and his subsequent statements were involuntary.  Under the instant circumstances,

17  the incriminating statements Defendant Luna Zapien made after he withdrew his request for

18  counsel are admissible.  Defendant's Motion to Suppress Statements for *Miranda* Violation

19  and for Involuntariness (Doc. 148) should be denied.

20  **Disclosure**

21  Defendant Luna Zapien seeks disclosure of impeachment evidence regarding the CS.

22  Defendant Luna Zapien argues that because the Government "will rely on hearsay statements

23  from the [CS]...to support its contention that it had probable cause to order the stop of Luna

24  Zapien's vehicle on February 10, 201[2]", he requires the disclosure to aid in cross-

25

26      [3]In its Supplemental Brief (Doc. 156, Att. 2), the Government submitted photos

27  purportedly of the hallway area where Defendant Luna Zapien was questioned. The photos
    were not presented at the evidentiary hearing and the Government has provided no

28  foundation for their consideration here.

1   examination of the Government witnesses.  (Doc. 150).  Prior to the October 1, 2013
2   evidentiary hearing, the Government disclosed transcripts of taped phone conversations
3   between the CS and Defendant Luna Zapien.  (TR. p. 4).

4        As set forth fully above, the agents' probable cause determination did not rely solely
5   on information from the CS.  The agents also personally observed Defendant Luna Zapien
6   act consistently with the information provided by the CS.  Time and again, Defendant Luna
7   Zapien showed up at time and place as the CS indicated he would.  After the first meeting
8   inside the minivan with Defendant Luna Zapien and the other co-defendants, the CS, who
9   had been under constant surveillance and searched prior, produced drugs and no longer had
10  in his possession the $9,000 agents had given him for the drug deal.  Further, recorded
11  conversations between the CS and Defendant Luna Zapien also gave law enforcement reason
12  to believe that Defendant Luna Zapien was participating in drug trafficking.  Agent Souza
13  and TFO Ramirez were subject to cross-examination as to what the CS told them, their
14  relationship with the CS, and their interaction with him.  Not only does the record contain
15  indicia of the CS's reliability as borne out by Defendant Luna Zapien's actions and recorded
16  telephone statements, as well as the presence of drugs after the first meeting in the minivan,
17  but the record also overwhelmingly shows probable cause for the arrest.  Consequently, on
18  the instant record, Defendant's Motion to Compel Disclosure of Impeachment Evidence Re:
19  Confidential Informer should be denied to the extent that Defendant seeks such information
20  for purposes of the suppression hearing.  *See e.g. McCray v. State of Ill.,* 386 U.S. 300 (1967)
21  (affirming conviction where trial court denied disclosure of confidential informant's identity
22  for purposes of a probable cause hearing).  However, the Motion should be denied without
23  prejudice with leave to refile should Defendant Luna Zapien have grounds to seek such
24  information for trial purposes.  Given the proximity of trial, any such brief must be filed on
25  an expedited basis.

26  **RECOMMENDATION**

27       For the foregoing reasons, the Magistrate Judge recommends that the District Court,
28  after its independent review deny: (1) Defendant's Motion to Suppress Evidence and

1    Statements for Fourth Amendment Violation (Doc. 147) and (2) Defendant's Motion to

2    Statements and Evidence for *Miranda* Violation and for Involuntariness (Doc. 148).

3    Additionally, Defendant's Motion to Compel Disclosure of Impeachment Evidence Re:

4    Confidential Informer (Doc. 150) should be denied to the extent that Defendant Luna Zapien

5    seeks such disclosure for purposes of the suppression hearing; however, the motion should

6    be denied without prejudice to re-filing within **five (5) days** from the date this Report and

7    Recommendation is filed should Defendant Luna Zapien have grounds to seek information

8    for trial purposes.  Given the proximity of trial, the Government shall have **three (3) days**

9    after service of any such motion to file a response.

10          Pursuant to 28 U.S.C. §636(b), Rule 59 of the Federal Rules of Criminal Procedure,

11   LRCrim 12.1 and LRCiv 7.2(e)(3), any party may serve and file written objections within

12   **fourteen (14) days** after being served with a copy of this Report and Recommendation.  No

13   replies to objections will be permitted without leave of the District Court.  If objections are

14   filed, the parties should use the following case number: **CR 12-583-TUC-DCB.**

15          Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver

16   of the right to review.

17          DATED this 23rd day of October, 2013.

18

19

20                              **CHARLES R. PYLE**
                               **UNITED STATES MAGISTRATE JUDGE**

21

22

23

24

25

26

27

28